UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No. 5:22-CR-58 |
| | ) | |
| BERK ERATAY, | ) | |
| Defendant. | ) | |

**OPPOSITION TO DEFENDANT'S MOTION
FOR RELEASE ON PRE-TRIAL CONDITIONS**

On May 19, 2022, defendants Berk Eratay and Serhat Gumrukcu were charged with conspiring to hire Jerry Banks to murder Gregory Davis with Mr. Davis's death resulting. Eratay was arrested on May 24, 2022, at his home in Las Vegas, Nevada. He appeared for his Rule 5 removal to Vermont on May 26, 2022. The government moved for detention. Eratay moved for pretrial release. In connection with the Nevada hearing, the government filed a Response to Berk Eratay's Motion for Pretrial Release. Dkt. No. 11-7 and 11-8. The Nevada magistrate judge held the detention hearing on May 31, 2022, and ordered Eratay detained based on risk of flight. Dkt. No. 11-13. Eratay was transported to Vermont and arraigned on July 29, 2022. On August 12, 2022, Eratay moved this Court for pretrial release.

Eratay's motion for release fails to adequately address the risk of flight and his dangerousness to the community should he be released. Moreover, the conditions of release he proposes would do little to mitigate these risks. For the reasons set forth below, as well as those in the government's Nevada filing, Eratay poses a risk of flight; Eratay poses a danger; and there are no conditions of release which will mitigate either concern. Accordingly, the Court should deny Eratay's motion for release.

I.      Eratay Poses a Risk of Flight

The Bail Reform Act does not require the government to show that Eratay will actually

flee – rather, it asks whether the defendant poses a *risk* of flight.  *See* 18 U.S.C. § 3142(f)(2)(A).

A finding of risk of flight must be supported by a preponderance of the evidence. *See*, *e.g.*,

*United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d

4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). If the

government establishes a risk of flight, the Court must consider whether there are potential

conditions of release that will *reasonably assure* the appearance of the defendant.  *Id.* at

§ 3142(f). Undisputed circumstances establish that Eratay poses a risk of flight. He is charged

with an offense carrying a mandatory life sentence, and he has few connections that would

encourage him to remain in the United States. These undisputed circumstances alone

demonstrate a risk of flight. Further, each of the relevant factors outlined in 18 U.S.C. § 3142(g)

favors detention.

A.      *Seriousness of the Offense*

Eratay is charged with a violent crime involving a firearm that carries a mandatory life

sentence. This factor should have important weight in the Court's analysis. A defendant facing

life in prison has a significant motive to avoid trial.

B.      *Weight of the Evidence*

The government has assembled a strong case against Eratay. For purposes of this

response the government will highlight a few of the important aspects of the government's case.

To begin with, Eratay is the only link between Jerry Banks and Serhat Gumrukcu. The

government has developed an overwhelming case that Jerry Banks killed Gregory Davis, without

any motive but a pecuniary one. In late October 2017, Banks acquired a white Ford Explorer and

fitted it up to look like a law enforcement vehicle. Banks lived in Colorado but travelled frequently between October and January to Las Vegas. He took a reconnaissance trip to Vermont in mid-November. Banks acquired law enforcement items, including insignia and gear.  He drove from Colorado to Vermont in early January and kidnapped Davis posing as a United States Marshal. He shot Davis on the side of road. Banks did not know Davis. The evidence is clear that Banks was a hired hit man.

Davis's phone and computer reveal that the only serious dispute in Davis's life involved Serhat and Murat Gumrukcu, two Turkish brothers, who had been in a contentious business deal with Davis. Serhat lived in Los Angeles; Murat lived in Turkey. Eratay, who lived in Las Vegas, knew both. He worked for Serhat and hosted Murat, while Murat lived the United States from mid-December 2017 until March 2018.

Eratay's computer data shows his involvement. Early in the investigation, the government obtained a search warrant for Eratay's Google data, which contained what appears to be an Apple "Note," dated in July 2017, documenting personal information about Davis, including information from Davis's passport, such as his middle name and location of birth. The title of the Note is "Person of Interest." The government can independently establish that Gumrukcu had earlier received a copy of Davis's passport.

The money trail also confirms Eratay's role as a middleman in the murder scheme. Eratay's bank records show that between June 2017 and October 2017, Gumrukcu wired over $250,000 from a Turkish bank account to two different accounts controlled by Eratay, one of which Eratay had previously shared with a former girlfriend. During that same period, Eratay withdrew over $170,000 in currency in separate $9,000 withdrawals, putting plenty of cash in Eratay's hands to pay for the murder during the timeframe when Banks was planning the murder.

Eratay's own words further implicate him. Eratay was interviewed by law enforcement in April 2022, days after Banks was arrested. The agents conducting the interview did not accuse Eratay of participating in the murder, nor did they outline their suspicions involving Eratay. Eratay spoke with the agents but provided false exculpatory statements. For example, Eratay lied about having no knowledge of Davis. Moreover, he made various false statements about money he received from Serhat Gumrukcu. These false statements show Eratay's consciousness of guilt.

The government's case does not rely alone on this compelling circumstantial evidence. A coconspirator who dealt directly with Eratay will describe Eratay's participation in the murder-for-hire scheme. Multiple factors corroborate this coconspirator testimony. To begin with, this witness confessed to participating in the murder scheme in the absence of consideration on other potential charges; such a person is unlikely to falsely admit to murder and face many years in jail. Thus, there can be little doubt about the coconspirator's involvement. Further, the coconspirator provided numerous details that would only have been known by a participant in the scheme, including the fact that Serhat Gumrukcu was paying for the murder because of a problem Gumrukcu had with Davis. The coconspirator has told law enforcement and would testify at trial that Eratay asked him to find someone to kill a third party months before mid-2017. The coconspirator had contact with Banks about the murder in or about May 2017 when the conspiracy got more active. Eratay paid the coconspirator over $100,000 in cash for the murder, some in the fall of 2017 for preparation expenses, some of which the coconspirator provided to Banks.

Eratay's use of an encrypted communication app, Threema, provides additional proof of Eratay's role in the conspiracy. The coconspirator told law enforcement that Eratay directed the coconspirator to download and use Threema to communicate about the scheme. The

coconspirator used Threema to communicate with Banks. He also communicated independently with Eratay and on occasion Gumrukcu through these encrypted communications. Law enforcement was not aware of Threema's involvement in the scheme prior to receiving the coconspirator's information. Banks's Google information, however, shows that Banks downloaded Threema in May 2017, consistent with the coconspirator's statements. Moreover, after Eratay was interviewed by law enforcement in April 2022, Eratay directed his friend, Halis Kaya, to download Threema and use it to contact Serhat Gumrukcu if Eratay were arrested. Kaya attempted to follow these directions after Eratay was arrested in 2022. Threema thus shows how Eratay's computer knowledge facilitated the murder conspiracy.

Finally, other Eratay actions after the April 2022 interview provide further evidence. Eratay expressed concern about being arrested after his April 2022 interview and linked that problem to Gumrukcu. Gumrukcu also paid for Eratay's initial attorney after the interview, further supporting the conclusion that Eratay and Gumrukcu were jointly involved in the matters under investigation.

C.     *Defendant's History and Characteristics*

Eratay's history and characteristics also support detention. He is a citizen of Turkey, a country which is highly unlikely to extradite its own citizens to the United States. Eratay has few ties to the United States. He has lived in the United States for only a decade. His principal employer prior to his arrest was Gumrukcu, who is detained. While Eratay has the skills and experience to provide IT services, he could easily do that work outside the United States. Eratay purchased a home in Las Vegas recently but has a large mortgage and is unlikely to be able to maintain ownership of the property without Gumrukcu's continued support.

By contrast, Eratay has substantial connections outside the United States. His parents live in Turkey. Eratay has been communicating with his parents by phone regularly from jail in the Turkish language. The government has not had the opportunity to get these conversations translated but his family appears to have the means to help him get to Turkey should he cross the border into Canada or Mexico. Indeed, in other jail calls, Eratay has recently expressed a desire to live outside the United States. Based on a review of jail calls, Eratay has a girlfriend who lives in Russia. During a call on July 22, 2022, Eratay told the girlfriend that he would "give anything to be with her." During this conversation, he also promised that once his "problem" was "finished" he would come to her and live wherever she wants, "Turkey or Moscow."

Eratay appears to have access to funds to flee the United States. He has various assets in Las Vegas, including a new Corvette and some equity in his residence, which he could convert to cash. His Turkish family and friends presumably could funnel money to Eratay to pay for flight expenses and support him living in Turkey. Further, Gumrukcu, who has access to tens of millions of dollars, has a significant motive to fund Eratay's flight, and prevent Eratay from becoming a witness against him. Gumrukcu's family lives in Turkey and could provide Eratay and his family access to funds to assist Eratay in flight. Eratay has expertise in virtual currencies and likely has assets in virtual currencies. Eratay paid part of the fee for the murder using virtual currency and was working on virtual currencies at the time of his arrest. Virtual currency assets would allow for easier flight, because transactions would be harder to detect and investigate.

Finally, Eratay has previously used fraud to deceive the United States, as the government has substantial evidence that Eratay's United States Citizenship was obtained through marriage fraud. The government has interviewed the woman whose marriage to Eratay supported his citizenship application. She admitted to law enforcement during the interview (which occurred

with proffer protection) that the marriage was a fraud to help Eratay get United States citizenship. Eratay's computer skills and willingness to engage in fraud show how easy it would be for Eratay to create false documents to travel. This fraud also should give the Court pause to trust his representations.

II.     Eratay Poses a Danger to Others

A finding of dangerousness must be supported by clear and convincing evidence.  *See, e.g., United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.  Eratay's offense involves murder. There is strong evidence that Eratay hired a third party to kill someone at the behest of another, presumably for his own compensation. He has a significant motive to kill to secure his liberty, or to retaliate against those who he believes put him in criminal jeopardy. These facts establish by clear and convincing evidence that Eratay poses a danger to others. He was willing to kill for money and succeeded; he would be willing to kill or influence witnesses to avoid life in prison, and may succeed again.

III.    Eratay's Proposed Conditions of Release

Eratay spends no time countering the risk of flight and danger to others. Further, he makes little attempt to argue that, if the Court finds that the government has proven these risks, the Court can be reasonably assured that the risks can be mitigated by conditions of release. Eratay proposes that he would secure some sort of Vermont residence, where he would live with a friend under a curfew order and electronic monitoring. The Nevada judge rejected a similar proposal after Eratay's arrest. Location monitoring in rural Vermont usually faces serious technological difficulties. But even if it worked, electronic monitoring could not reasonably assure the Court that Eratay would not flee. An international border is mere hours from any Vermont residence. An ankle bracelet can be easily removed; it cannot prevent flight. Moreover,

a curfew and electronic monitoring do nothing to prevent Eratay from retaliating against a witness or others as he flees. The Court should therefore conclude that there are no conditions of release which would reasonably assure Eratay's appearance and the safety of the community.

IV.     Conclusion

For the reasons set forth above, the Court should deny the defendant's motion for release and order that Eratay remain detained pending trial.

Dated at Burlington, in the District of Vermont, August 26, 2022.

Respectfully submitted,

NIKOLAS P. KEREST
United States Attorney

By:     */s/ Paul J. Van de Graaf*
Paul J. Van de Graaf
Jonathan A. Ophardt
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725